Filed 2/16/23  In re A.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | C096494 |
| _____ | (Super. Ct. No. J09586) |
| NEVADA COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| B.H. et al., | |
| Defendants and Appellants. | |

B.H. (father) and E.C. (mother) appeal from the juvenile court's orders terminating their parental rights and freeing A.C. (the minor) for adoption.  (Welf. & Inst. Code, §§ 366.26, 385.)[1]  The parents cite *In re Caden C*. (2021) 11 Cal.5th 614 (*Caden*

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

*C*.) and argue the juvenile court abused its discretion when considering the beneficial parental relationship exception to adoption and declining to apply the exception to this case.  (§ 366.26, subd. (c)(1)(B)(i).)

The parents also argue the Nevada County Department of Social Services/Child Welfare Services (Department) as well as the juvenile court failed to comply with the inquiry and notice requirements under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.).

As we will explain, because we agree the juvenile court did not fully consider the appropriate factors when determining whether the beneficial parental relationship to adoption applied here, we reverse and remand for further proceedings, including compliance with the ICWA.

### FACTUAL AND PROCEDURAL BACKGROUND

Because the parents' appellate challenge to the juvenile court's orders is limited to the application of the exception at issue here, we relate only those facts from the record that are necessary for our determination of that issue.[2]

The minor was born in June 2016.  In October 2019, the Department filed a section 300 petition naming the minor and based on his parents' neglect.  (§ 300, subd. (b)(1).)  The juvenile court ordered the minor detained and subsequently sustained the petition.  The minor was placed in a foster home.

During the January 2020 disposition hearing, the juvenile court adjudged the minor to be a dependent, and found it was in his best interests to provide reunification services to mother, but bypassed father.  (§ 361.5, subd. (b)(13).)  The court ordered supervised twice-weekly in-person visitation with the parents.

---

[2]  We discuss the facts surrounding the ICWA inquiry in Part II of our Discussion, *post*.

Reports from December 2019, and April, July, and September 2020 noted that mother's visits with minor were appropriate and went well. The social worker opined that the minor was bonded with mother and appeared comfortable during the visits. The parent educator, who met with the minor and mother together, described mother as loving, appropriate, and bonded with the minor.

The October 2020 12-month status report noted mother had admitted to using illicit substances multiple times since January 2020, and she was suffering from mental health issues that were impacting her ability to care for herself and the minor. The minor had a positive and loving connection with mother, and he was sometimes disappointed to leave her during their twice-weekly visits.

The juvenile court continued services for mother and visitation for both parents.

The 18-month status report filed in April 2021 noted that the minor had been diagnosed in February 2021 with posttraumatic stress disorder and was receiving treatment. His psychologist described him as "high risk" and in need of a "safe, predictable home environment."[3] Mother's visits with the minor continued to go well, but during the May 2021, 18-month review hearing, the juvenile court terminated mother's services and set a section 366.26. hearing, finding mother had failed to participate regularly and make substantial and substantive progress in the court-ordered treatment plan.[4]

---

[3] The minor had been moved from his initial foster home in May 2020 and placed with the maternal grandfather. In July of 2020, the minor had been moved to another foster home because his grandfather fell ill.

[4] In July 2021, mother requested a bonding study and filed a section 388 petition that the juvenile court construed as a request for return of the minor. The court ultimately denied these requests, and neither parent challenges these rulings on appeal.

*Initial Section 366.26 hearing*

The August 2021 section 366.26 report recommended terminating parental rights and freeing the minor for adoption by the current caregivers, with whom the minor had been placed since June 2021. The minor continued to receive mental health services and was doing well. He had a "sense of safety in his new home" and was "attaching securely" to his caregivers, who wanted to adopt him. He called them both "mommy," was affectionate with them, and sought them out for safety and security. The report noted the minor had been out of his parents' care for over 22 months since the inception of the current case.

During the September and October 2021 contested section 366.26 hearing, Dr. David Foster, a psychiatrist, testified on behalf of the Department that, when he started treating the minor in January 2021, the minor had been "very regressed in his behaviors." The minor's behavior was now "remarkably improved," and he was catching up developmentally. Foster attributed the positive changes to "stability in placement" and therapy. The minor appeared very comfortable with his current caregivers and sought comfort from them, when he previously would be withdrawn and avoided comfort from others. He also seemed less anxious. In contrast, Foster opined that the minor did not appear to have a deep emotional connection with mother.

In Dr. Foster's opinion, the benefits to the minor from terminating the parents' parental rights "way outweigh the hazards for the loss." The minor was at a critical developmental stage and needed to make a healthy attachment soon. The minor felt safe and understood with his current caregivers, and he would suffer damage if their relationship was severed. Moreover, the minor would be able to "recover" if he could not see mother again.

A social worker testified that, when asked, the minor said he wanted to live with father or his current caregivers because they made him feel safe. In her opinion, it would not be difficult for the minor to move forward without mother because he had bonded

4

with his current caregivers and felt comfortable with them. Also, he had no issues leaving mother after their visits ended.

*Continuance of Hearing for Bonding Study*

As relevant here, the juvenile court found minor to be adoptable. The court then noted it had considered *Caden C.* and other recent cases that explained the necessary considerations with respect to application of the beneficial parental relationship exception to adoption. The court reviewed the entire history of the case, focused on the minor's relationship with mother. Although the minor had improved with his new placement and treatment, mother had been a "constant" in the minor's life throughout the case, even when she was not doing well. She had maintained regular visitation that generally was positive, including a period of unsupervised overnight visits. The court (correctly) noted that, under *Caden C.*, mother's current ability to care for the minor was irrelevant. Noting that there was "enough evidence that the beneficial relationship may very well apply," the court ordered a bonding study to help it determine whether the minor would be harmed from termination of his relationship with mother.

In December 2021, the juvenile court appointed Dr. Kevin Dugan, a psychologist, to perform the study and address the following questions: "1. Do [the minor] and [mother] have a parent-child relationship? If yes, describe the relationship. [¶] 2. If the answer to question #1 is yes, does [the minor] have such a substantial, positive emotional attachment to [mother] such that the child would be greatly harmed if this parent-child relationship were terminated? [¶] 3. If the answer to question #2 is yes, would continuing this parent-child relationship promote the well-being of the child to such a

5

degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents?"**5**

The juvenile court further ordered Dr. Dugan to review recent case law regarding the beneficial parental relationship exception prior to initiating the interviews with mother and the minor, including *Caden C.* and *In re B.D.* (2021) 66 Cal.App.5th 1218. Dugan would also receive a copy of all relevant materials, including visit notes and social worker reports. The court authorized the Department to include the current caregivers in the study, at its own expense, reasoning that the nature of the caregivers' relationship with the minor was relevant as to whether this possible adoptive placement might offset any harm that would come from severing the minor's relationship with mother.

Dr. Dugan submitted his report in January 2022. Mother had told him that her relationship with the minor was "well-developed and strong," and he tended to act out when he was unable to see her. The current caregivers told him they had "well-developed attachment relationships" with the minor, and he never asked for mother when he was upset, and he did not talk about her between visits.

Dr. Dugan separately observed the minor interacting with mother and his current caregivers. During the session with mother, the minor perceived her as "an adult, parent figure" and was "consistently engaged" with her. At the end of their session, the minor comfortably said goodbye to mother and was briefly disappointed but quickly returned to playing. As for the current caregivers, the minor also perceived them as parental figures. The three were "consistently and positively engaged" during the session. When Dugan spoke with the minor, he identified the current caregivers as his main sources of safety and security.

---

**5** As we discuss *post*, this language does not track *Caden C.* Further, the duty to weigh the harm to a child from losing their parents against the benefits of placement in an adoptive home properly falls to the *court*. (See *Caden C., supra*, 11 Cal.5th at p. 640.)

6

Based on his review of the case history and his observation sessions, Dr. Dugan opined that the minor had a "meaningful parent-child relationship" with *both* mother and his current caregivers. Dugan further opined that the minor would experience short-term emotional pain and distress if he were unable to see mother again. However, it was difficult to predict the "nature, type, and strength" of any negative impact over the long term. Although the minor was "thriving" and "improving" with his current caregivers, he also had positive interactions with mother during their regular visits. Given their positive relationship, Dugan opined that the minor would be "greatly harmed" if his relationship with his mother was terminated. The minor would also experience harm if his relationship with his current caregivers was terminated: "This child has experienced multiple attachment disruptions, and to lose these two important attachments at this point in his life in my opinion would be very difficult on this young child."

With respect to the court's second and third questions, Dr. Dugan noted that minor was currently five and a half years old, and the "sensitive period" for a child to develop and deepen attachment relationships only lasted until age six or seven years. Dugan noted that the minor had been struggling in his attachment relationships but had shown "tremendous" improvement during his current placement. In Dugan's opinion, the current caregivers "are very important for this child's tremendous improvements, and current and ongoing overall development." Although the minor was also positively benefitting from his relationship with mother, he had a "heightened need for stability, security, safety, and consistency" as he progressed through childhood, and those needs were being met in his current placement. The minor would likely miss his mother, but he would also likely "continue to demonstrate healthy cognitive and psychosocial development if adopted by [his current caregivers], even if [mother] were not in his life." In sum, Dugan noted this was a " 'close-call' " but ultimately opined that "any well-being [the minor] would experience by continuing his relationship with [mother] d[id] not outweigh the well-being he gains from being in a permanent, adoptive home with his

7

current caregivers." In Dugan's opinion, the minor's recent and "substantial improvement" should be supported and was the "more important psychological factor in this case."

*Final Section 366.26 Hearing and Ruling*

At the continued hearing in March 2022, no additional testimony was presented. The juvenile court ultimately terminated parental rights and selected a permanent plan of adoption. With respect to the beneficial parental relationship exception to adoption, the court noted this was a "difficult case" and mother had made "great strides" lately. The court reiterated that mother had maintained regular visitation and contact with minor. In addition, there was a substantial, positive, emotional attachment between mother and the minor. The court noted that the minor had been through significant trauma, and substantial effort had "gone into stabilizing him." The court then announced it was "adopting the findings that were set forth in Dr. Dugan's report" and, reading directly from the report, found that " 'the wellbeing that [the minor] would experience by continuing his relationship with his mom does not outweigh the wellbeing he gains from being in a permanent, adoptive home with his [current caregivers].' "

The juvenile court continued with findings from Dugan's report concerning the "nature and strength of his attachment relationship" with his current caregivers as well as the improvement the minor had made while in their care. The court then terminated parental rights.

## DISCUSSION

### I

*Beneficial Parental Relationship Exception*

The parents contend the juvenile court erred in finding the beneficial parental relationship exception did not apply. The parties agree that mother maintained consistent visitation with the minor and demonstrated a significant, positive, emotional attachment with him. The dispute is over the adequacy of the remainder of the required findings,

8

namely, whether the harm that the minor would experience if the parental relationship were terminated is outweighed by the benefit provided by an adoptive home. (*Caden C., supra*, 11 Cal.5th at pp. 633-634.)

Mother argues that the juvenile court's third question to Dr. Dugan, i.e., whether "continuing this parent-child relationship [would] promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with adoptive parents," led Dugan (and ultimately the court) to incorrectly focus on the *benefit* mother could confer on the minor, rather than the *harm* caused by termination of that relationship, such that the harm was never appropriately compared to the benefits of an adoptive home, as required per *Caden C.* (See *Caden C., supra*, 11 Cal.5th at p. 632 ["[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home"].)

Mother adds that the juvenile court compounded the error when it merely "adopted" Dr. Dugan's answer to the question as its finding on that issue and then "simply concluded that it did not wish to disrupt the progress that [the minor] had made" with the current caregivers.

The Department responds that the language of the question posed by the juvenile court and later answered by that court in its adoption of Dr. Dugan's findings was "not improper" and the deviation from *Caden C.* in that the question sidestepped the required detriment inquiry was "a matter of semantics."

We agree in relevant part with mother.

A. *Applicable Law*

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child . . . . *The permanent plan preferred by the Legislature is adoption*. [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights

9

absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when the parents have maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of parental rights would be detrimental to the child. (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception]; *Caden C., supra*, 11 Cal.5th at pp. 639-640.)

For the beneficial parental relationship exception to apply, the parent "must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent -- the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C., supra*, 11 Cal.5th at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*Caden C., supra*, 11 Cal.5th at pp. 639-640; *In re K.P.* (2012) 203 Cal.App.4th 614, 622.)

B. *Analysis*

As *Caden C.* instructs, juvenile courts considering the third element of the beneficial parental relationship exception must determine "how the child would be affected by losing the parental relationship -- in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C., supra*, 11 Cal.5th at p. 633.) Here, as is apparent from the court's analysis of the application of the exception as we have set forth above, Dr. Dugan, and ultimately the court, focused their analysis on the *benefit* the minor was deriving from his placement with his *current caregivers* and compared it to the *benefit* derived from his relationship with mother, rather than considering the *detriment* to him from losing his relationship with his mother and the question of whether the benefit of *an adoptive home* would outweigh that detriment. Indeed, as we have described, Dugan concluded that the minor was benefitting from his positive relationship with mother, and that terminating the relationship with mother would *greatly harm* the minor, but then stressed that the minor was doing very well with his *current caregivers*. Dugan warned that terminating the minor's relationship with his *current caregivers* would be "very difficult," especially since the minor had "experienced multiple attachment disruptions."

But that was not the question required to be answered. Dr. Dugan's report did not address the fact that losing his mother would also be an attachment disruption to the minor, but instead stressed the importance of minor's recent progress with his current caregivers. As *Caden C.* makes clear, a focus on the suitability of the current placement is incorrect. (*Caden C., supra*, 11 Cal.5th at p. 634.) "What courts need to determine . . . is how the child would be affected by losing the parental relationship – in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)

When continuing the hearing to order a bonding study, the juvenile court opined that the exception at issue here "may very well apply." In his report, Dr. Dugan opined

that terminating the minor's relationship with his mother would cause him *great harm*, and that the determination was a "close call," but that the well-being conferred on the minor by his relationship with mother did not outweigh the well-being conferred by remaining with his current caregivers. Although the court adopted this conclusion, it did not answer the question posed by *Caden C*. In failing to do so, the court abused its discretion. Accordingly, in this close case, although we acknowledge and appreciate the effort made by the juvenile court to secure additional information from experts and to carefully consider the evidence before it, we must reverse the orders terminating parental rights.[6]

## II

### *The ICWA*

The parents also argue the juvenile court and Department failed to comply with the ICWA. The Department does not argue compliance was achieved, but argues any error was harmless. Because we are remanding for a new section 366.26 hearing, we will order compliance with the ICWA on remand, and need not address harmlessness.

A. *Background*

In October 2019, both parents told the social worker they had no known Indian ancestry, and they both completed ICWA-20 forms. Although father's ICWA-20 form merely indicated that "a previous ICWA-20 form has been filed with the court," he later confirmed orally to the juvenile court that he did not have Indian ancestry. The court also confirmed that both parents lacked any known Indian heritage during the October 2019

---

[6] Given our conclusion that reversal is required, we need not reach mother's argument that the juvenile court should have ordered guardianship with the current caregivers as a way to provide the minor with stability while also preserving his relationship with mother. That is an argument that may be made on remand.

12

detention hearing.  Although the paternal grandmother was present during that hearing, the court did not ask her about Indian heritage.  The court found the ICWA did not apply.

In the August 2021 section 366.26 report, the Department noted that the court had found that ICWA did not apply in October 2019, and, "based on the Department's continual inquiry and family finding efforts," there was "no new information" to show reason to know that the minor was an Indian child.  Beyond this vague assertion, there is no evidence in the record on appeal that the Department addressed, much less fulfilled, its ongoing duty of inquiry.  Nor is there any indication in the record that the juvenile court ever inquired of any relatives.

B.  *Analysis*

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings.  [Citations.]  A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' " (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings.  First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.  (§ 224.2, subds. (a), (b).)  Second, if that initial inquiry creates a 'reason to believe' the child is an Indian child, then the Agency 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.)  Third, if that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply.  (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian

child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)

As a preliminary matter, we reject father's contention that the juvenile court failed to make ICWA findings in its March 2022 orders. Given that the court found the ICWA did not apply in October 2019 and then stated in March 2022 that all prior orders not in conflict were to remain in full force and effect, we conclude the court expressly and adequately found that the ICWA did not apply.

However, with respect to the inquiry undertaken in this case, there is no record that accessible grandparents were ever asked about Indian ancestry, even though the minor was placed with maternal grandfather in 2020 and paternal grandmother appeared in court in 2019. Beyond the grandparents--who clearly were accessible--there is no evidence the Department or court asked *anyone* beyond the parents about ancestry. This was error. The Department acknowledges its failure to inquire of the minor's extended family members, but argues the error was harmless because the parents denied Indian ancestry and there was no evidence the minor might have Indian heritage.

The juvenile court and the Department have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).) Given the parents' consistent representations that they did not have Indian heritage, and the Department's report that despite "continual inquiry" no evidence of such heritage was found, it is certainly likely that the error was harmless. However, because the record does not reflect sufficient inquiry by the court and the Department, and we are remanding this case for further proceedings, we will order compliance with the ICWA as part of our reversal of the orders terminating parental rights.

14

**DISPOSITION**

The orders terminating parental rights are reversed.  On remand, the juvenile court shall also require compliance with and make new findings in accordance with the ICWA, as described in this opinion and under applicable law.

/s/
Duarte, Acting P.J.

We concur:


/s/
Krause, J.


/s/
Earl, J.